# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 10, 2013

## STATE OF TENNESSEE v. STEPHEN WAYNE DAVIS

**Appeal from the Circuit Court for Madison County**
**No. 11-621      Donald H. Allen, Judge**

---

**No. W2012-01656-CCA-R3-CD  - Filed November 8, 2013**

---

The defendant, Stephen Wayne Davis, appeals from his 2012 Madison County Circuit Court jury convictions of guilty of one count each of aggravated kidnapping, robbery, and attempt to commit rape.  On appeal, the defendant challenges the sufficiency of the convicting evidence.  Because the record supports the jury verdicts and because we conclude that principles of due process do not invalidate the aggravated kidnapping conviction, we affirm the convictions.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined, and THOMAS T. WOODALL, J., concurred in results only.

Stephen C. Bush, District Public Defender; and Gregory D. Gookin, Assistant District Public Defender, for the appellant, Stephen Wayne Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The conviction offenses at issue stem from events that occurred on July 20, 2011, in a vacant dwelling house at 49 Derbyshire in Jackson.  The victim of the offenses, L.P., was a real estate agent who held a listing contract for the property at 49 Derbyshire.[1]

The evidence at trial as accredited by the jury showed that on July 20, 2011,

---

[1]To protect the anonymity of the victim, we utilize her initials.

the victim went to show the house to a man who had called her by telephone earlier in the day and who had identified himself as "Josh Banks." The victim testified that the man who arrived to meet her at the house was the defendant. She said that while she was seated at a table during the showing, the defendant came around the table, "slapped" handcuffs on one of her wrists, and pulled her in an effort to cuff the other wrist. The victim resisted and engaged in a struggle with the defendant that "seemed to go on forever" before the defendant forced the victim onto her knees in the kitchen floor where he cuffed the other wrist. The victim testified that the defendant had both her hands behind her back and that he "pull[ed] this black nylon dog collar and he put[] it in [her] mouth like this and he start[ed] cinching it up."

The defendant then pulled her down a hall, put her into a bathroom, and slammed the bathroom door. With her hands cuffed, the victim nevertheless managed to turn on a light, lock the bathroom door, and sit down. Shortly thereafter, the defendant kicked in the door and said, "'So you thought you'd be funny and lock the door?'" The victim testified that the defendant held what appeared to be a "black looking noose." She believed it was made of wire wrapped in black duct tape.

The defendant pulled the victim into the master bedroom and ordered her to lie face-down in the closet. The victim testified that she believed she was about to die and wondered, "[W]hat is this going to feel like to be killed?" The defendant then pulled up her legs one at a time and attached them to the handcuffs. The defendant returned to the kitchen where the victim heard him "wrestling around," and then she heard the front door slam. Afterward, the victim struggled with her bindings and managed to get her feet loose. Still handcuffed and gagged, she ran out the back of the house "screaming and crying" and entered a neighbor's house. The female neighbor harbored the victim and called the police.

On cross-examination, the victim testified that the defendant removed none of her clothing. She denied that the defendant touched either her or himself in a sexual manner. The victim testified that she did not see a gun or a knife.

The victim testified that about three days after the attack she began experiencing numbness in both hands that persisted for about a month. She did not seek medical treatment and thought the numbness was a result of the pressure of the handcuffs. The victim testified that she experienced "horrible nightmares, flashbacks" that have caused her "to seek counse[]ling."

The victim agreed that during the attack the defendant said that he was not going to hurt her.

-2-

Jackson Police Officer Andrew Bright testified that on July 20, 2011, he responded to a call to investigate trouble at 49 Derbyshire. He encountered the victim, who had a "collar" around her neck. Officer Bright identified and offered into evidence without objection photographs he took of the house including a photograph showing damage to the bathroom door.

Brittany Mowell testified that she lived at 57 Derbyshire on July 20, 2011, next door to 49 Derbyshire. On July 20, 2011, while performing yard work, she saw a white van pull into the driveway at 49 Derbyshire and park in front of a realtor's car. Ms. Mowell identified the defendant as the person who arrived in the van and who was shown around the property by the victim. At some point, Ms. Mowell went inside her house to cool off, and her "front door came swinging open and [the victim] was in my kitchen." Ms. Mowell described the victim as "distraught . . . screaming at the top of her lungs." Ms. Mowell testified that the victim had "like a ball gag, it was like a collar or some sort of thing that was tightened to the back of her head." Despite the gag, the victim was able to tell Ms. Mowell, "I think he is going to kill me." Ms. Mowell described the victim's clothes as "distraught"; the victim's knee-length skirt was "all turned around backwards and her shirt was like mangled looking." The victim had no shoes, and her hair had been mussed. The victim wore handcuffs behind her back. Ms. Mowell took the victim to a bedroom, obtained a gun, and called the police.

Ronnie Kirk, an employee of Hutcherson Metals, testified that in July 2011, he was on Henderson Road picking up "aluminum cans" when he "came across a purse approximately 25 to 30 yards from the intersection of Henderson Road and Ridgecrest." Mr. Kirk picked up what appeared to be scattered contents of the purse, placed them back into the purse, and took the purse home. He tried to call the person whose identification information appeared in the purse, but when he was unable to reach her, he called the police.

On cross-examination, Mr. Kirk agreed with a police report that he found the purse on July 23, 2011.

Jackson Police Investigator Aubrey Richardson testified that at about 11:00 p.m. on July 20, 2011, the defendant came to the police department where, after waiving his *Miranda* rights, he gave a statement reduced to writing by Investigator Richardson. The statement introduced without objection by Investigator Richardson provided in pertinent part that earlier that day the defendant's wife had asked him to move out of their home. He collected "'some clothes and personal items'" and "'grabbed a pair of handcuffs and a gag that goes around your mouth'" that he "'later used on Derbyshire.'" In the statement read by Investigator Richardson, the defendant said, "'I had an idea of what I was about to do then, but I didn't know where or who I was going to do it to.'" The defendant admitted that

he had the handcuffs and collar-gag because he had been "'into bondage'" for eight or nine years and that he and his wife had participated in this activity. The statement then provided:

> When I grabbed the gag and cuffs, it was my idea to tie a woman and gag her somewhere and have sex with her. I left home thinking about how to make this happen. I was riding around . . . and ended up on Derbyshire. I saw this house for sale. . . . I noticed the agent on the sign was a female and it had her cell phone number. I called her from my cell phone and told her that I wanted to look at the house. I told her my name was Josh Banks. She told me she couldn't do it right then but told me to meet her between 4:15 and 4:30. . . . [Later,] I got to Derbyshire and the agent was already there. . . . [W]hen I saw her I thought she was attractive and I told myself do I want to go through this or not. I went in and she introduced herself. We looked through the house and talked. . . . [Later,] she turned towards me while sitting in the chair. She had this skirt on. I looked at her legs and skirt for about three or four seconds. I think she noticed me staring down there and she closed her legs. . . . She extended her left hand to shake my hand and I grabbed her hand and then took the handcuffs out of my back pocket and I put one cuff on her wrist, the one I had a hold of. In addition to the handcuffs and gag, I had a foam coated metal hanger-type thing that holds my ladder down on my van stuck in my pocket too. When I got the one cuff on, we fought forever trying to get the other cuff on. She was fighting not to get cuffed. She kept trying to get up and I would grab her and pull her back down. She was screaming and saying stop. Stop. Stop. She kept saying don't hurt me and don't do this. I kept telling her to hush and sit down. I was finally able to get her other arm cuffed. I cuffed her behind her back. I took the gag out and put it around her mouth. She wasn't able to scream as much. I stood her up and I walked her away and at one time in the hall, I stumbled and we sort of fell together into the bathroom door and broke it. Then I took her to the closet in the master bedroom and told her to lay down on her stomach. She said she didn't want to, but she finally did. I took the wire thing out and I put it around her legs and then around the lengths in the cuffs doing what I would call hog tying her. At that point, I was so panicked because of the way she was screaming in the kitchen, I was sure someone

probably heard her. I decided not to have sex with her, but to leave. Her skirt was hiked up a little bit too. I closed the closet door. I went back to the kitchen and I took her phone and was going to delete my number from where I had called her, but I couldn't figure out how it worked so I threw it in her purse and I took the purse. I knew if the police found my number in the phone then they would identify me. . . . I left there and drove to one of those trash bins on Highway 70 . . . [and] threw the purse in the trash. I didn't look in the purse and I didn't steal nothing from it. I just threw it away . . . .

On cross-examination, Investigator Richardson testified that his conversation with the defendant was initiated by the defendant's telephone call to the officer.

At this point, the State rested its case-in-chief. Following the trial court's overruling a motion for judgment of acquittal, the 27-year-old defendant testified.

The defendant said that in July 2011, he lived with his wife and three children in Jackson and was self-employed as a plumber, carpenter, and electrician. He testified that he and his wife were separating and that he "was short on cash and . . . needed money to pay [his] utility bill." He said he got $60 "from" the victim and gave it to his mother to pay his bills because he "was going to be in custody because [he] did commit the crime." He testified that he bound and gagged the victim because he "was scared maybe if [he] tried to take [the victim's] purse that she would run and [he] needed a way to keep her from running and exposing who [he] was and maybe get [his] license number." He said that after he left the victim in the bedroom closet, he went to the kitchen and took the victim's purse.

The defendant acknowledged that he committed a crime that had terrified the victim. He denied that he harbored any intent to hurt the victim. He said that he told the victim, "I don't want to hurt you. I'm going to leave." Despite his pretrial statement, which he acknowledged, he denied that he intended to do anything sexually; rather, he testified that his purpose was to obtain money. The defendant testified that he had never before been arrested although he had received one speeding ticket.

The defendant testified that he was stressed while giving his statement to Investigator Richardson and that he "actually started breaking down and crying because this wasn't the type of person that [he'd] lived to be and it's not the type of person [he is]." He said that the part of the statement that referenced an intent to perform a sexual act was not true.

On cross-examination, the defendant said that he selected the victim at random. He testified that he found $60 in the victim's purse and that he left the victim's cellular telephone in the purse when he tossed it "off the side of the road" near the corner of Ridgecrest and Henderson Road. The defendant acknowledged that in his pretrial statement he denied taking anything from the victim's purse.

The defendant testified that his efforts to get money also included selling an old stove for junk and seeking help from Area Relief Ministries and the "government." The defendant said that he opted to carry out a robbery at a house for sale because, unlike a store or a bank, the house would have no security cameras. Nevertheless, he maintained that the plan to rob the victim was a "whim" and a "spur of the moment" decision.

The defendant denied an intent to bind a woman and have sex with her. He testified that he was exhausted when he gave his statement and just wanted to sleep. He maintained that Investigator Richardson "made this whole thing sound like it was all about sex, but it was about money." The defendant testified that the mention of sex in the statement was not his idea, saying, "That's the investigator's thought of what I wanted to do." The defendant said that he was surprised when the investigator mentioned the defendant's "seeing [the victim's] panties and . . . vagina because that thought never crossed [his] mind until he mentioned something about it." The defendant testified that the investigator asked him whether he thought the victim's neighbor had attractive breasts. The defendant maintained that the investigator "kept interrogating" along these lines and "sounded like a broken record." He added, "[I]t was the same thing over and over and it just got so annoying, I finally said the heck with it. I wanted out of there." The defendant denied seeing a picture of the victim on the real estate sign. The defendant agreed that he never attempted to correct his statement to delete the references to sexual intent.

The jury convicted the defendant of aggravated kidnapping, robbery, and attempt to commit rape. The trial court sentenced the defendant to an effective sentence of 12 years in incarceration. Following the denial of the defendant's timely motion for new trial, the defendant filed a timely appeal to this court. His single claim is that the evidence was insufficient to support his convictions.

## I. Sufficiency of the Evidence

As an appellate court, we essentially view a different evidentiary mosaic than did the trier of fact. We see the same tesserae as did the trier of fact, but on appeal the full mosaic has been altered: Different hues emanate from the fact trier's inferences and credibility shadings, and from the appellate perspective of the overall image, we see in highlight the features most favorable to the State. *See State v. Cabbage*, 571 S.W.2d 832,

836 (Tenn. 1978) (holding that, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom). Our critique of the image, thus highlighted, is aimed at determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

A jury's verdict of guilty removes the presumption of innocence and raises a presumption of guilt on appeal. *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009); *see also State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973); *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977). The jury's guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all factual conflicts in favor of the theory of the state. *See Hanson*, 279 S.W.3d at 275; *see also State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978).

## A. Aggravated Kidnapping

As charged in the indictment in this case, "[a]ggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed: (1) To facilitate the commission of any felony or flight thereafter." T.C.A. § 39-13-304(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). In the present case, the State elected rape as the felony that was the object of the false imprisonment for purposes of Code section 39-13-302(a)(1).

Essentially, the defendant posits that the State failed to prove that the defendant committed false imprisonment to facilitate a rape. He points to the lack of any sexual activity or sexual conversation. The evidence, however, contained the defendant's pretrial statement in which he admitted that he intended to restrain a woman in order to engage in sex with her. This confession was then corroborated by the independent evidence of the actions of the defendant in handcuffing, gagging, and shackling the victim. Although in his trial testimony the defendant denied that he had sexual designs on the victim, the jury could and did reject this testimony, apparently relying instead upon the pretrial statement. The evidence established the other elements of aggravated kidnapping. As a whole, the evidence, including the defendant's statement, supports the conviction of aggravated kidnapping.

*B. Robbery*

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). In the present case, the indictment alleged that the robbery was accomplished by "putting [the victim] in fear and/or by violence."

To challenge his robbery conviction, the defendant points to the prosecutor's statement to the trial court that "[t]he robbery we believe was an afterthought." The defendant claims that, based upon the State's theory that the defendant bound and gagged the victim as a means of perpetrating rape, the subsequent taking of the victim's purse and its contents was merely a theft.

To begin, we note that it is "immaterial whether the defendant had a *purpose* of depriving the victim of her property." *State v. Wade P. Tucker*, No. M2001-02298-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Nashville, July 17, 2002), *perm. app. denied* (Tenn. Dec. 23, 2002) (emphasis added). "By inserting as an element of theft that the offender must obtain the property 'with the intent to deprive the owner' of the property, the legislature obviously did not intend that the offender's purpose must be the owner's loss or deprivation." *Id.*; *see* T.C.A. § 39-14-103. "Thus, regardless of the ultimate motive or purpose, the offense is established when the evidence shows that the defendant intended to deprive the owner of property when the defendant knowingly obtained or exercised control over the property." *Id.*

"The use of violence or fear elevates theft to robbery." *State v. Swift*, 308 S.W.3d 827, 831 (Tenn. 2010) (citing *State v. Bowles*, 52 S.W.3d 69, 80 (Tenn. 2001)). "'[W]hether a taking is properly characterized as a theft or a robbery is contingent upon whether and when violence or fear is imposed.'" *Id.* (quoting *State v. Owens*, 20 S.W.3d 634, 638 (Tenn. 2000)); *see also State v. Buggs*, 995 S.W.2d 102, 105-06 (Tenn. 1999). The violence or fear must "precede or be contemporaneous with the taking." *Owens*, 20 S.W.3d at 641.

In terms of alignment of the violence or putting a victim in fear with the actual taking, the "afterthought" type of robbery has been somewhat perplexing. In *Wade P. Tucker*, we took note of the "'traditional rule' that the State need not prove that the defendant assaulted the victim for the purpose of theft, when the proscriptive statute does not recite that the 'force must be used for the purpose of committing the theft.'" *Wade P. Tucker*, slip op. at 6 (citing 2 Wayne R. Lafave & Austin W. Scott, *Substantive Criminal Law* § 8.11 at 454

(1986)); *see generally State v. Shawnda James*, No. 01C01-9803-CC-00093 (Tenn. Crim. App., Nashville, Aug. 11, 1999) (upholding a conviction of especially aggravated robbery and concluding that defendant James was able to steal the victim's property because she previously had shot and killed the victim, despite defendant's claim that the post-homicide taking was an "afterthought"). In the traditional view, "the nexus between the theft and the antecedent assault is supplied when the defendant merely exploits the victim's disabled condition by stealing the victim's property." *Wade P. Tucker*, slip op. at 6. Even though we noted in *Wade P. Tucker* that "the Tennessee robbery statute appears to accommodate this traditional rule and to be similar to the statutes in other jurisdictions where the traditional rule has been applied, and even though this court followed the traditional rule in *Shawnda James*," we noticed a somewhat contradictory position taken by our supreme court in *State v. Buggs*, 995 S.W.2d 102 (Tenn.1999):

> In *Buggs*, a felony-murder case, the defendant stabbed his girlfriend to death after he "snapped" during an argument. Afterward, he stole the victim's cash and used it to purchase cocaine. Despite *Buggs*'s characterization of the decision to steal the money as an "afterthought," our supreme court held that the evidence was sufficient to convict Buggs of felony murder – murder committed in the perpetration of a robbery. The court acknowledged that, in a felony-murder case, when the killing precedes the commission of the predicate felony, "there is a split of authority [among] the various jurisdictions as to whether intent to commit the felony must exist concurrent[ly] with the commission of the homicide, or whether intent formed after a killing is nonetheless sufficient to bring a case within the felony-murder rule." The *Buggs* court ultimately concluded that "for the felony-murder doctrine to be invoked, the actor must intend to commit the underlying felony at the time the killing occurs."

*Shawnda James*, slip op. at 7 (internal citations omitted). Despite this conclusion, we noted, the *Buggs* court held that the "jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit a felony prior to, or concurrent with, the killing." *Buggs*, 995 S.W.2d at 108. "Thus," we said, "in a felony-murder case in which the predicate felony is robbery, *Buggs* requires that the intent to steal be formed prior to or concurrently with the assault upon the victim." *Wade P. Tucker*, slip op. at 7. We observed that if this "'prior to or concurrently with'" rule is to be applied "as means of defining the robbery as a predicate to felony murder, it contradicts the traditional rule that, in applying a robbery statute such as Tennessee's, the force or violence

-9-

used against the victim need not be for the purpose of theft." *Id.*

Ultimately, in *Wade P. Tucker*, we concluded that *Buggs* articulated a rule of felony murder law and not a rule of robbery law. "In *Buggs*, the high court carved out a special rule for felony-murder cases, '[g]iven the fact that the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is "transferred" to elevate an unintentional killing to first-degree murder.'" *Id.*, slip op. at 7. Also, we emphasized that the predicate felony for felony murder purposes in *Buggs* was merely robbery; "an injury to the victim was not a required element of this predicate offense, and there was no need to analyze the culpability for the injury as a means of finding the elements of the predicate offense. The [*Buggs*] court was examining the culpability for the homicide." "As such," we concluded, "*Buggs*'s 'prior to or concurrently with' rule has no application in an especially aggravated robbery prosecution." *Id.*

Turning to the present case, we acknowledge that this latter basis for not applying *Buggs* in *Wade P. Tucker* is inapt here. As in *Buggs* and unlike *Wade P. Tucker*, the offense at issue in the present case is merely robbery. Thus, the issue whether the intent to steal must precede or be contemporaneous with the violence or putting the victim in fear in the present case is troublesome. Ultimately, however, the facts in the present case preempt that determination. In *Buggs*, the court said that the "jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit a felony prior to, or concurrent with, the killing." *Buggs*, 995 S.W.2d at 108. Indeed, the *Buggs* court concluded, *see id.*, as did the *Wade P. Tucker* court, *see Wade P. Tucker*, slip op. at 7, that a jury could reasonably have inferred that the larcenous intent was formed prior to or contemporaneously with the assaultive conduct. In the present case, the basis for such an inference is palpable because the defendant actually testified that he initially encountered the victim with the intent to rob her. On that basis, it becomes insignificant whether an antecedent or contemporaneous intent was required.

### C. Rape

As charged in this case, "[r]ape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" where "[f]orce or coercion is used to accomplish the act." T.C.A. § 39-13-503(a)(1). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: . . . (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101.

The defendant's attack upon his conviction of attempt to commit rape is

-10-

grounded in his claim that the handcuffing – the State's basis for a finding of a "substantial step" in committing rape – is the "exact same action" upon which the aggravated kidnapping conviction was founded. "If [the defendant] committed the offense of Aggravated Kidnapping by handcuffing [the victim]," he argues in his brief, "he, by definition, did not commit any other act that could be seen as a 'substantial step' towards the commission of rape."

We interpret this claim to bespeak not so much a sufficiency-of-the-evidence claim as it does a claim of a due process violation pursuant to *State v. White*, 362 S.W.3d 559 (Tenn. 2012). For this reason, we will address the due process issue below in a separate section. Before we do, however, we hold that the evidence is sufficient to support the jury's conclusion that the defendant took a substantial step in forcing or coercing penetration of the victim. The jury had before it the defendant's pretrial statement that he intended to bind a woman and have sexual relations with her. The victim testified that the defendant forcibly handcuffed her and then gagged and "hog-tied" her.

Before we leave the rubric of sufficiency of the evidence of attempt to commit rape, we mention that we are aware that the State's theory underlying this conviction may be viewed as inconsistent with the theory underlying the conviction of robbery. The former suggests an intent to commit a sexual act, and the latter may require that an intent to steal precede or be contemporaneous to the violence or putting the victim in fear. We are constrained, however, from interfering with jury verdicts because they may be perceived to be inconsistent. *See United States v. Powell*, 469 U.S. 57, 67 (1984) ("Courts have always resisted inquiring into a jury's thought processes.").

Each count of an indictment is viewed as a separate offense. *Wiggins v. State*, 498 S.W.2d 92 (Tenn. 1973).

> Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*State v. Gennoe*, 851 S.W.2d 833, 836 (Tenn. Crim. App. 1992). Thus, we do not fathom the reasoning behind the verdicts in this case. Also, we recognize that the jury could have

inferred that the defendant harbored *both* intents when he captured the victim.[2]

## II. Due Process Issue

*White* developed a methodology for applying established due process principles that govern the joint prosecution of a kidnapping offense with another felony the commission of which necessarily involved the restraint on movement of the victim. The use of principles of due process to prohibit kidnapping convictions when the elements overlap those of an accompanying offense began with *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991). *See State v. White*, 362 S.W.3d 559, 577-78 (Tenn. 2012); *see also State v. Bennie Osby*, No. W2012-00408-CCA-R3-CD, slip op. at 7-10 (Tenn. Crim. App., Jackson, 2012), *perm. app. denied* (Tenn., Mar. 5, 2013) (detailing history from *Anthony* to *White*). In *White*, the supreme court changed the approach to applying due process principles to a kidnapping charge joined with another charge with overlapping elements, and it adopted a standard by which trial courts are obliged "to provide clear guidance to the jury . . . [to] ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *White*, 362 S.W.3d at 578. The court said,

> When jurors are called upon to determine whether the State has
> proven beyond a reasonable doubt the elements of kidnapping,
> aggravated kidnapping, or especially aggravated kidnapping,
> trial courts should specifically require a determination of
> whether the removal or confinement is, in essence, incidental to
> the accompanying felony or, in the alternative, is significant
> enough, standing alone, to support a conviction.

*Id.* The court added, "In our view, an instruction of this nature is necessary in order to assure that juries properly afford constitutional due process protections to those on trial for kidnapping and an accompanying felony." *Id.* Essentially, the court intended to give the jury

---

[2]We acknowledge that mutually exclusive verdicts have been distinguished from merely inconsistent verdicts. *See State v. Chris Jones*, No. W2009-01698-CCA-R3-CD (Tenn. Crim. App., Jackson, Mar. 9, 2011). The "key difference" between the two doctrines is said to be "that mutually exclusive verdicts involve two positive findings of fact, whereas inconsistent verdicts involve one positive finding of fact and 'the failure to make a positive finding of fact as to the other.'" *Id.*, slip op. at 12 (quoting *Jackson v. State*, 577 S.E.2d 570, 574 n.3 (Ga. 2003)). "When two verdicts are mutually exclusive, the jury, 'in order to find the defendant guilty on both counts, necessarily reached two positive findings of fact that cannot logically mutually exist.'" *Id.* (quoting *Jackson*, 577 S.E.2d at 574). We find, however, no Tennessee case recognizing or applying the doctrine of mutually exclusive verdicts, and this court in *Chris Jones* declined to apply it.

a "definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty." *Id.* It promulgated a jury charge to require "the jury to ascertain, in the first instance, whether the movement or confinement of the victim was 'essentially incidental' to that which is part of an accompanying offense." *Id.* at 580-81.

In *Terrance Antonio Cecil*, the supreme court determined that the holding in *White* applies to cases that were in some stage of the appellate process when *White* was filed on March 9, 2012. *Terrance Antonio Cecil*, ___ S.W.3d at ___, M2011-01210-SC-R11-CD, slip op. at 10-11 (Tenn. Aug. 12, 2013). The court iterated that

> "[b]ecause the due process issue at stake is now deemed a factual issue to be determined by the trier of fact and not a legal issue to be determined by the trial court, *an appellate court that embarks upon determining the 'sufficiency of the evidence' on this issue despite the absence of the necessary, enabling instruction usurps the role of the trier of fact*."

*Id.*, ___ S.W.3d at ___, slip op. at 12 (quoting *Bennie Osby*, slip op. at 12 n.3).

*White* was filed on March 5, 2012. The defendant in the present case was convicted on February 15, 2012, and the case proceeded to this appeal in a timely fashion. Accordingly, we deem it in the appellate process as of the time *White* was filed.

The jury instructions were not included in the appellate record in the present case. Nevertheless, because the case was tried a few weeks before *White* was filed, we will presume that the trial court did not impart the mandated instruction to the defendant's jury. We believe that the issue of overlapping kidnapping elements with elements of the accompanying charges was fairly raised in the case, and therefore, the failure to give the *White* instruction was error. *See Bennie Osby*, slip op. at 12.

That said, we hold that such error was harmless beyond a reasonable doubt. *See id.* "To determine the harmfulness of the error, we . . . evaluate the harmful effect of the absence of the required jury instruction." *Id.*; *see White*, 362 S.W.3d 580 n.20 (indicating that the issue is subject to constitutional harmless error analysis by stating that remand for a new trial was warranted in *White* because the court could not "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error"). As in *Bennie Osby*, proof in the present case that the victim's "removal or confinement went beyond that necessary to accomplish either of the accompanying felonies was overwhelming." *Bennie Osby*, slip op. at 13. The handcuffing and "hog tying" of the

victim clearly exceeded any restraint necessary to effect a robbery or a rape, and we conclude, as we did in *Bennie Osby*, that "the jury's verdict would have been the same had it been properly instructed." *Id.*

### III. Conclusion

In light of the foregoing analyses, we hold that the evidence was legally sufficient to support the defendant's convictions and that the conviction of aggravated kidnapping was not infirm as a deprivation of due process of law. Accordingly, the judgments below are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE